UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| YASMIN A. BECKFORD<br>12001 Old Columbia Pike, U514<br>Silver Spring, MD 20904<br><br>Plaintiff,<br><br>v.<br><br>HENRY M. PAULSON, JR.,<br>SECRETARY OF THE TREASURY<br>1111 Constitution Ave., NW<br>Washington, DC 20224<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

1.       Plaintiff Yasmin A. Beckford brings this action for damages based on the denial of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (hereinafter "Title VII"). Specifically, the Department of the Treasury (hereinafter "the Agency") subjected her to sex discrimination, *quid pro quo* sexual harassment and a hostile work environment by her supervisor. After filing an EEO/EEOC charge concerning the harassment, the Agency also retaliated against Ms. Beckford in violation of Title VII.

## JURISDICTION AND VENUE

2.       The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a)(4), and 42 U.S.C. § 2000e-5.

3.       The claims asserted herein arose in the District of Columbia which is also the location of the acts relevant to the claims set forth in this Complaint. Pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3), venue is also proper in the District of Columbia, which is

the location where the Agency has its principal office and where, upon information and belief, the employment records relevant to the Complaint are located.

## THE PARTIES

4.  Ms. Beckford started on February 22, 2004 as a GS-301-12 Staff Assistant in Information Technology Services ("ITS") at the Internal Revenue Service ("IRS") of the Department of the Treasury. She was the only African-American, non-temporary, female in the office. Ms. Beckford is currently still employed with IRS, but no longer works in ITS. Prior to her employment with the IRS, Ms. Beckford had devoted over five years of service in the Peace Corp, as an Administrative Assistant to the Office of Inspector General and the Peace Corp Information Collection and Exchange Section in the Peace Corp's official library. Ms. Beckford performed satisfactorily at the Peace Corp and obtained relevant job skills for her position at ITS.

5.  Defendant Henry M. Paulson, Jr. is the Secretary of the United States Treasury. The Secretary is being sued in his official capacity as provided by law based on his executive responsibility for administering the Agency's personnel policies and his responsibility to enforce and to promote equal employment opportunity throughout the Agency. During the relevant time period, the Agency has employed over 500 employees.

6.  Mr. Terence Lutes is not a named defendant in this lawsuit but Ms. Beckford listed him in her EEO complaint as the discriminatory management official. Mr. Lutes was the Associate Chief Information Officer of Information Technology Services, and a senior executive on the staff of the IRS Commissioner. He was Ms. Beckford's direct supervisor and the person who subjected Ms. Beckford to most of the discrimination, *quid pro quo* sexual harassment and hostile work environment set forth herein.

**FACTS**

7.      According to IRS Document 7591 (Rev. 5-2001), "it is the policy of the Internal Revenue Service that all employees will be able to enjoy a work environment free from all forms of discrimination, including sexual harassment."  This official policy is available to all IRS employees and managers online.

8.      The Vacancy Announcement for Ms. Beckford's Staff Assistant position indicated that she would be responsible for performing a variety of analytical, advisory and administrative duties and functions related to the management of ITS.  Ms. Beckford became interested in the position based on this position description and the fact that the job had a career ladder progression in the program management sector of IRS.  However, her actual job duties differed from the position description and she was instead primarily responsible for providing Mr. Lutes with administrative and technical support.  In particular, Ms. Beckford was responsible for Mr. Lutes' calendar, scheduling meetings, making travel arrangements for Mr. Lutes, maintaining office logs, distributing in-coming and out-going correspondence and other related duties.

9.      Mr. Lutes' work required him to travel extensively and to participate in meetings outside of the office.  Because of his schedule, Mr. Lutes was a frequent traveler and it was common for him be away for days and/or weeks at time.  As a result, he relied heavily on his administrative staff, Ms. Beckford, to support him in carrying out his duties.

10.     Ms. Beckford's job duties and responsibilities were generated by the amount of administrative tasks which arose in connection with Mr. Lutes' work.  As a result of this, Ms. Beckford's interactions with others in ITS was somewhat limited as she spent much of her time communicating with his subordinate direct reports and other third parties concerning official IRS

correspondence and to arrange conferences, executive leadership meetings and travel for Mr. Lutes.

11. When Ms. Beckford started her job with ITS in February 2004, she was a competitive service, probationary employee. Thus, during her first year of employment, the Agency could terminate Ms. Beckford's employment without having to demonstrate just cause for termination.

12. From her very first day of employment, Ms. Beckford quickly learned that her co-workers created a hostile, demeaning and intimidating work environment in ITS which Mr. Lutes tolerated. Furthermore, whenever Mr. Lutes was in the office, he would sexually harass Ms. Beckford and subject her to abusive behavior. Ms. Beckford was fearful of Mr. Lutes because he threatened to take adverse action against her if she complained or made any protest about his behavior or that of her co-workers. Ms. Beckford felt trapped and isolated, particularly since she was a probationary employee and new to the Agency. She lived in absolute terror that Mr. Lutes, a well-connected official in the Agency, would carry out his repeated threats.

13. Ms. Beckford's first day of work was indicative of her tenure with ITS. The workday was uneventful until the end of the workday when, at around 4:00 p.m., Diane Maroney, former Executive Assistant/Program Analyst in ITS, approached Ms. Beckford from behind and, unprovoked, violently pushed her out of her chair. Ms. Beckford heard a sharp snap in her neck and back, forcing her to grab the desk edge to keep from falling to the floor. Ms. Maroney then turned off the lights and rudely told Ms. Beckford: "It's time for you to go." Ms. Beckford was stunned and flabbergasted. Because Ms. Maroney had turned off the lights, Ms. Beckford had to put her coat on and gather her belongings in the dark.

14.     Ms. Maroney's aggressive, physical assault injured Ms. Beckford and aggravated damage to Ms. Beckford's cervical spine for which she underwent a cervical spine discectomy to correct the damage and to hopefully abate the loss of use in her left arm.

15.     At the first opportunity to do so in a private conference, Ms. Beckford informed Mr. Lutes about Ms. Maroney's attack. Mr. Lutes' merely responded that Ms. Maroney would be leaving soon and that she had emotional problems. No action was taken by Mr. Lutes to stop Ms. Maroney from physically assaulting Ms. Beckford.

16.     When Mr. Lutes was in the office, he would regularly hold an early morning staff meeting. During once such meeting, in late February or early March 2004, Mr. Lutes stated to Ms. Beckford that he "couldn't wait until the first sexual experience with [Ms. Beckford]" and that "the earth was going to move" during that experience. Ms. Beckford was so stunned and shocked that she was unable to reply and, instead, quickly left the room.

17.     In late March or April 2004, while on a business trip, Mr. Lutes called Ms. Beckford to check-in and to have her call the persons he was meeting to inform them that his plane was late. During the conversation, completely out of context, he suddenly declared: "I want your pussy." Thereafter, he hung-up the phone before Ms. Beckford could muster a reply.

18.     On April 5, 2004, Chief Information Officer W. Todd Grams issued a memorandum to all ITS employees, including Mr. Lutes. The memorandum stated ITS' sexual harassment policy and stated that "sexual harassment is unacceptable conduct that will not be tolerated in the ITS organization."

19.     From early summer 2004 through October 2004, Mr. Lutes made several lewd comments to Ms. Beckford. These remarks included, but are not limited to statements such as:

"Why won't you take me home with you?"; "Why won't you come to my apartment?"; and "You can do the *easy* thing to advance."

20. Mr. Lutes also told Ms. Beckford that he "enjoys all flavors of women" and that he has had sexual encounters with black secretaries before and with many women on his staff, including women of all races.

21. Mr. Lutes did not limit his sexual harassment to words. Mr. Lutes would often grunt in a sexually suggestive manner as he approached Ms. Beckford anytime he found her alone. Sometimes he would also grab at her breasts. On one occasion, Mr. Lutes stood in front of Ms. Beckford and ran his hands down in front of her body and pushed his hips forward in a humping motion. On another occasion, as Ms. Beckford turned around from her desk, Mr. Lutes grabbed his crotch as he looked at her. Mr. Lutes' actions frightened and humiliated Ms. Beckford.

22. Because of Mr. Lutes' sexually suggestive comments and actions, Ms. Beckford avoided being alone with Mr. Lutes whenever possible and would try to minimize interaction with him. For example, when she and Mr. Lutes were the only employees in the office, she would refrain from making any sounds so she would not alert Mr. Lutes of her presence. She also had to remain aware of her physical presence when he was around because of the chance that he would try to touch her breast or grab at her.

23. In approximately August 2004, Mr. Lutes hired another Administrative Assistant, Kathleen Upton, who replaced a co-worker who was retiring. Ms. Beckford later learned from Ms. Upton that she had a history with Mr. Lutes because they worked together in the Electronic Tax Administration ("ETA"). Ms. Upton indicated to Ms. Beckford that she had a relationship

with Mr. Lutes during her prior employment with him and that she considered her current work experience a reunion for them.

24. Ms. Beckford observed sexually suggestive and inappropriate behavior involving Ms. Upton and Mr. Lutes. For example, Ms. Upton intimately embraced Mr. Lutes in front of Ms. Beckford. Oftentimes Ms. Upton would be alone with Mr. Lutes in his office or would follow Ms. Beckford to the door and lock the door behind Ms. Beckford when she left at the end of the work day.

25. Wanting to know her performance and to get feedback on her work, in approximately late August 2004, Ms. Beckford requested a mid-year performance appraisal from Mr. Lutes. In response, instead of discussing her performance, Mr. Lutes asked Ms. Beckford why she was not interested in "buying the winning lottery ticket" from him. Ms. Beckford understood this to be Mr. Lutes' way of informing Ms. Beckford that everyone else knew what to do to advance in the workplace and she should go along with his demands as well. Indeed, thereafter, Mr. Lutes began to corner Ms. Beckford more regularly, grasping at her breasts, and making other such lewd gestures, such as approaching Ms. Beckford near her desk and pushing his crotch into her face while he stood over her.

26. After many requests about her appraisal, finally on October 7, 2004, Ms. Beckford met with Mr. Lutes to discuss her mid-year performance. Although he praised some of Ms. Beckford's accomplishments, Mr. Lutes focused on her working relationships with other staff, Mr. Lutes' subtle way of informing Ms. Beckford that he did not appreciate the fact that she did not consent to his advances. He relayed that there had supposedly been anonymous and unsolicited voice mails which he intended to include in her mid-year review. According to Mr. Lutes, these voicemails and other comments were negative, although he refused to allow her to

listen to any of them. Ms. Beckford never learned the specifics about what these comments entailed.

27. During the meeting, Ms. Beckford asked Mr. Lutes for constructive feedback on her performance. Mr. Lutes responded that "it didn't matter what [her] educational achievements were, there was only one way to advance." He emphasized that "all those who had ever worked for [him] knew what they had to do . . . and why couldn't [she] just figure it out."

28. Mr. Lutes also told Ms. Beckford that all of the women working in his office had worked for him previously and that they knew what they needed to do be promoted by him. Mr. Lutes stated with words to the effect that: "Look at Kathleen [Upton], she's pretty stupid, but she's figured out how to make it work for her. You're pretty and smart, how come you can't figure out how to make it work for you?"

29. The appraisal process was used by Mr. Lutes as a form of intimidation to get Ms. Beckford to sleep with him. Foreshadowing Ms. Beckford's complaining to EEO about his actions, Mr. Lutes informed Ms. Beckford that if she reported the harassment, she would lose her job. He insisted that that no one would believe her.

30. That same day, Ms. Beckford memorialized in a memorandum her meeting with Mr. Lutes about her mid-year review. In the memorandum, which she provided to Mr. Lutes, Ms. Beckford rebutted the observation that she was rigid and unresponsive. She admitted that she was still learning the job and improving and that she appreciated the feedback because it gave her the opportunity to resolve issues before they became unsolvable and prevented surprises.

31.     On or about December 7, 2004, while Ms. Beckford was dropping off copies of pre-read materials for Mr. Lutes in a conference room, Ms. Upton kicked Ms. Beckford as she was leaving the conference room.

32.     Ms. Beckford regularly used the Agency's gym and she would bring a week's worth of her workout clothing to work on Monday, keep it under her desk, and take it home on Friday.  Mr. Lutes was aware that her gym bag was stored under her desk because he would store work under the desk, such as applicant files from the selection panels he served on.  In May 2004 until approximately December 2004, Ms. Beckford noticed that someone had been rummaging through the workout clothing she stored under her desk.  Then, in mid-December 2004, while getting ready to workout in the gym, she noticed that one of her workout pants was damp and folded neatly in her gym bag which she had left overnight under her desk.  Although she was surprised to find the workout pants damp, and because she was already nearly dressed for the daily workout, she still decided to put the garment on and proceed with her workout.  Within a few minutes after she started running on the treadmill, she noticed an overwhelming odor of stale semen coming from the garment.  She immediately discontinued her workout and left the room to change.  The experience humiliated and embarrassed her.  She was unable to wear the garment again, threw it away, and the degrading experience prevented her from mentally and emotionally returning to the gym.

33.     On or about December 13, 2004, Ms. Beckford and Mr. Lutes met to discuss her current performance.  Mr. Lutes indicated once again that he had supposedly received negative voicemail messages about her work, but would not identify for Ms. Beckford who were the alleged callers.  Finally, Mr. Lutes mentioned that Ms. Upton had complained that she did not

enjoy going to work because of Ms. Beckford. At this meeting Mr. Lutes also gave Ms. Beckford formal documentation of his feedback of her midyear performance.

34. That day, as she had done during her mid-year review, Ms. Beckford sent Mr. Lutes a memorandum memorializing their December 13th discussion. She also responded to criticisms Mr. Lutes offered of her alleged "teamwork" issues which was actually doublespeak for her refusal to respond to Mr. Lutes' sexual advances. She indicated she was concerned about Mr. Lutes' "teamwork" comments and stated that she would not have applied for the position if she knew she would be working in a secretarial support position. She also took exception to the unidentified, ambiguous and anonymous comments supposedly made about her to Mr. Lutes. She referenced her positive appraisals from her prior managers, especially their comments regarding her team contributor attributes. Ms. Beckford also attached to the memorandum a brief list of some of her many team participation accomplishments since her start date.

35. Ms. Beckford observed that Mr. Lutes did not discipline female staff with whom Ms. Beckford observed that he had a previous working relationship. For example, in August 2004, Ms. Beckford received an e-mail from outside the office requesting the credit card number and expiration date of Ms. Beckford's government credit card on behalf of a colleague, Mary Ellen Corridore. Mr. Lutes and Ms. Corridore were traveling to San Francisco and the request was supposedly made as part of the travel arrangements. However, the request was inappropriate because Ms. Beckford was ultimately responsible for the card and that responsibility required her to be informed of any intended use. Further, the card was specifically issued for purchasing office supplies and not to make travel arrangements. Ms. Corridore also had her own government credit card for travel which should have been used instead of the purchase card issued in Ms. Beckford's name. Despite Mr. Lutes being informed that Ms. Corridore tried to

use a government credit card inappropriately, he still did not seek to take any disciplinary measures.

36. On or about January 28, 2005 Mr. Lutes approached Ms. Beckford, leaned over her desk and kissed her on the lips. At no time before taking this inappropriate and unwelcome action did Mr. Lutes say anything to Ms. Beckford to indicate that he would kiss her. And, at no time did she invite him to kiss her.

37. Mr. Lutes' kissing Ms. Beckford startled her and left her stunned, speechless, and extremely distraught because she had no desire or intent to engage in intimate physical or sexual contact with him. After the January 28, 2005 kissing incident, Ms. Beckford was so upset and distressed that she took leave. Mr. Lutes soon went on travel status for eleven days.

38. Ms. Beckford did not immediately report the kissing incident because she was a probationary employee who feared that Mr. Lutes would retaliate against her for complaining about the incident. Because she was only weeks away from completing her probationary period, Ms. Beckford was too frightened too report this and other incidents for fear that Ms. Lutes would carry out his earlier, repeated threats.

39. On or about February 7, 2005, Ms. Beckford sent Mr. Lutes a letter. In that letter, she indicated that Mr. Lutes had informed her that he had known her coworkers for several years and, for that reason, was biased in favor of them. She described the December 2004 situation where Ms. Upton kicked her. She said she could not continue working in that environment and requested a transfer to another work area where "physical danger" was "not part of the risk of coming to work here at the IRS." Ms. Beckford was too terrified of losing her job to report on the specifics of the *quid pro quo* harassment she had suffered at the hands of Mr. Lutes.

40. On or about February 17, 2005, Mr. Lutes notified Ms. Beckford that he had read her February 7th request for a detail and/or a transfer and anticipated that she would be transferred immediately. He told her then that she should not worry, because "I'm not going to come after you and get you back."

41. Ms. Beckford became more afraid of Mr. Lutes after that statement. She wondered why he would make such a statement. She was very concerned that he would attempt to terminate her before her probationary period ended.

42. Mr. Lutes often told Ms. Beckford that everyone in the office supposedly disliked her. Ms. Beckford perceived Mr. Lutes' comment as a defense he was creating should Ms. Beckford ever mentioned his abuse and harassment. By such comments, he made it plain that Ms. Beckford's female co-workers would support his version of any story over the events that actually happened to Ms. Beckford.

43. On or about February 21, 2005, Mr. Lutes held one of his regular morning staff meetings. During this meeting, before Ms. Beckford arrived, Mr. Lutes told the staff that he was getting rid of Ms. Beckford and that he was going to arrange for her to be fired. Unbeknownst to Mr. Lutes, Ms. Beckford was just about to enter the staff meeting and overheard his comments.

44. On or about February 22, 2005, as Ms. Beckford was preparing to put some food in the microwave, Mr. Lutes approached her from behind. He put his arms around her waist and hips and caressed her thigh near her crotch. Surprised and stunned, Ms. Beckford reacted by screaming and by elbowing Mr. Lutes in the collarbone to move him away from her. Mr. Lutes responded to her reaction by stating: "Oh. I'm sorry I bumped into you." He then left the room.

45. On or about March 4, 2005, Ms. Beckford gave Mr. Lutes a letter where she described that she was experiencing symptoms characterized as Post-Traumatic Stress Disorder

('PTSD") since the incident in which Ms. Maroney shoved her from her chair on her first day of work. Her symptoms included difficulty sleeping, extreme headaches, gastrointestinal upsetness, and other physical ailments caused by the extremely stressful work environment.

46.     On or about March 15, 2005, Ms. Beckford and Mr. Lutes met to discuss her request for a detail and/transfer. Mr. Lutes brought up her interactions with her co-workers as a pretext to create a performance issue and Ms. Beckford, in response, noted that she had been attacked by other employees, specifically Ms. Upton and Ms. Maroney. Mr. Lutes ignored her and informed Ms. Beckford that he intended to give her departure rating as her final rating.

47.     After her March 15, 2005, meeting with Mr. Lutes, Ms. Beckford filed her informal EEO complaint with the Agency.

48.     On or about March 16, 2005, Ms. Beckford learned of her non-promotional detail to Enterprise Operations Services.

49.     On or about April 13, 2005, Ms. Beckford received her Notice of Right to file a formal EEO complaint. On or about September 22, 2005, the Agency accepted Ms. Beckford's formal EEO complaint.

50.     On or about April 28, 2005, Ms. Beckford received her performance appraisal which covered the period from April 1, 2004 to March 31, 2005. Because Mr. Lutes sought to punish Ms. Beckford for refusing his advances, and to create a pretext for the complaint filed by Ms. Beckford, he gave her an overall rating of 2.4, or minimally successful, despite the fact that Ms. Beckford's work was satisfactory and she deserved a higher rating. Mr. Lutes created performance issues by falsely claiming that Ms. Beckford could not get along with her coworkers as a potential defense against her sexual harassment charges.

51.     Mr. Lutes' sham performance appraisal had a negative impact on the terms and conditions of her employment, as Ms. Beckford eventually learned, on or about May 25, 2005, that she was ineligible for a Management and Program Analyst position for which she applied because she had "received a less than fully successful performance evaluation."

52.     On or about August 2, 2005, in retaliation for refusing his sexual advances and for filing the EEO complaint, Mr. Lutes presented Ms. Beckford with a notice of intent to issue a letter of reprimand for alleged falsification of a SF-85 background investigation and a notice of her right to request alternative discipline. The allegations were untrue as Ms. Beckford had not made any misrepresentations on her SF-85 form. The IRS' investigation of Mr. Lutes' complaint exonerated Ms. Beckford and concluded that she gave accurate and correct information on the SF-85 form.

53.     On or about September 7, 2005, and prior to the conclusion of the IRS investigation which cleared Ms. Beckford of the false charges, Mr. Lutes attempted to coerce Ms. Beckford to sign an alternative discipline agreement related to the SF-85 background investigation.

54.     On or about October 13, 2005, the Agency accepted Ms. Beckford's amendment to her EEO complaint to include her retaliation claims.

55.     In October 2005, the Agency reassigned Ms. Beckford to the Data Management Services Branch of the Business Systems Development Division.

56.     As recently as November 28, 2005, and most likely earlier, Defendant's Administrative Procedures for Managers ("APM") Guide contained information about sexual harassment. The APM Guide distinguished two principal types of sexual harassment: *quid pro*

*quo* and hostile or offensive work environment. The APM Guide was available online to IRS managers, including Mr. Lutes.

57.   Ms. Beckford has met bimonthly with A. Jack Anders, ACSW, LCSW-C, to discuss, *inter alia*, family and work-related problems. She has described to Mr. Anders the anxiety, embarrassment, and emotional distress Mr. Lutes caused her, including his *quid pro quo* sexual harassment, abuse, and other offensive behavior, as well as the improper conduct of her co-workers.

58.   As a direct and proximate result of the unlawful acts of Defendant and/or agents or employees acting on its behalf, Ms. Beckford has suffered grievous harm to her professional career and reputation and the ability to advance her career. Ms. Beckford has suffered objectively tangible harm because of Defendant's unlawful actions. This harm includes, but is not limited to, loss of substantial past and future salary, awards, benefits and entitlements, loss of professional status and career-enhancing opportunities and loss of retirement savings and benefits.

59.   As a direct and proximate result of the actions by Defendant and/or agents or employees acting on its behalf, Ms. Beckford has suffered grievous harm to her health. Defendant has caused Ms. Beckford to suffer from great emotional distress, embarrassment, humiliation, pain and anguish, as well as Post Traumatic Stress Disorder and aggravation of an injury to her cervical spine. Additionally, as a result of Defendant's harassment, intimidation, retaliation, and harm to her career and professional reputation, Ms. Beckford was forced to use leave.

60.   As a direct and proximate result of the retaliation, Ms. Beckford has been denied employment opportunities. Ms. Beckford further alleges that these acts violate Title VII and that

she has suffered and will continue to suffer severe emotional and mental distress and loss of employment benefits, opportunities and career advancement.

## EXHAUSTION OF REMEDIES

61. Ms. Beckford exhausted all administrative requirements that apply to the processing of her complaint, including the filing of an informal and a formal complaint with the Agency's EEO office and an EEOC complaint.

## STATEMENT OF CLAIMS

### COUNT I: Sex Discrimination and Sexual Harassment against Ms. Beckford in Violation of Title VII.

62. Ms. Beckford adopts and incorporates by reference paragraphs 1-61 above.

63. Title VII prohibits employers from discriminating against its employees on the basis of sex. This prohibition includes sexual harassment and hostile work environment.

64. Ms. Beckford alleges that Defendant and/or agents or employees acting on its behalf, subjected her to *quid pro quo* sexual harassment and a hostile work environment in violation of Title VII, 42 U.S.C. §2000e-3.

65. Ms. Beckford additionally alleges that Defendant and/or agents or employees acting on its behalf, subjected her to sex discrimination, sexual harassment and a hostile work environment. Ms. Beckford further alleges that these acts and practices violate Title VII as well as the statutory provisions and regulations that specifically apply to the federal government as an employer.

66. As a result of the sex discrimination, sexual harassment and hostile work environment, Ms. Beckford has suffered and is suffering considerable injury, including a

physically debilitating injury; loss of present and future earnings; mental distress; embarrassment; humiliation; and indignity. As a consequence of Defendant's actions, Defendant is additionally liable to Ms. Beckford for those damages as well as for attorneys' fees, the costs of this litigation, and accrued interest.

### COUNT II: Retaliation against Ms. Beckford for Engaging in Protected EEO activity in Violation of Title VII.

67. Ms. Beckford adopts and incorporates by reference paragraphs 1-66 above.

68. Title VII prohibits employers from retaliating against an employee for complaining about practices which the employee reasonably and in good faith believes are discriminatory.

69. In giving Ms. Beckford an unfair evaluation for the period from April 1, 2004 through March 30, 2005, Defendant was motivated by Ms. Beckford's protected activities under Title VII in opposing Defendant's sexual harassment and the hostile work environment Defendant created.

70. In making false accusations against Ms. Beckford on or about August 2, 2005, Defendant was motivated by Ms. Beckford's protected activities in opposing Defendant's sexual harassment and the hostile work environment Defendant created.

71. In attempting to coerce Ms. Beckford into signing an alternative discipline agreement in September 2005, Defendant was motivated by Ms. Beckford's protected activities in opposing Defendant's sexual harassment and the hostile work environment Defendant created.

72. Defendant knew and was aware of Ms. Beckford's protected activities at the time of these adverse actions and therefore violated Title VII, 42 U.S.C. §2000e-3.

73. Ms. Beckford additionally alleges that Defendant and/or agents or employees acting on its behalf, subjected her to adverse and disparate treatment in retaliation for her opposition to Defendant's unlawful employment practices and her participation in protected activity. Ms. Beckford further alleges that these acts and practices violate Title VII as well as the statutory provisions and regulations that specifically apply to the federal government as an employer.

74. As a result of Defendant's retaliation against her, Ms. Beckford has suffered and is suffering considerable injury, including a physically debilitating injury; loss of present and future earnings; mental distress; embarrassment; humiliation; and indignity. As a consequence of Defendant's actions, Defendant is additionally liable to Ms. Beckford for those damages as well as for attorneys' fees, the costs of this litigation, and accrued interest.

### **RELIEF SOUGHT**

**WHEREFORE**, Ms. Beckford demands judgment against the Defendant and respectfully requests the Court to:

A. Enter judgment for Ms. Beckford against Defendant on both Counts;

B. Declare that the conduct of Defendant which subjected her to *quid pro quo* sexual harassment and a hostile work environment is in violation of Title VII of the Civil Rights Act of 1964, as amended;

C. Declare that the conduct of Defendant which subjected her to retaliation is in violation of Title VII of the Civil Rights Act of 1964, as amended;

D. Award Ms. Beckford full back pay and front pay, including salary, benefits, cash awards, and other entitlements retroactive to the date of any unlawful action found to have

occurred in this case, such as the rejection of her application for other positions due to her minimally successful evaluation rating and expungement of her work records of any and all retaliatory and discriminatory evaluative narratives;

E.     Award Ms. Beckford compensatory damages for the injuries and losses that she suffered in an amount to be proved at trial, including damages for the permanent injuries suffered by Ms. Beckford as a result of Defendant's unlawful actions, such as all rehabilitation, medical care and other medical support and expenses;

F.     Enjoin Defendant from future retaliation and discrimination against Plaintiff;

G.     Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses Ms. Beckford has and will incur as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest; and,

H.     Order such other equitable and legal relief as the Court deems necessary and appropriate.

## JURY DEMAND

Plaintiff requests a trial by a jury as to all claims set forth in her Complaint.

Respectfully submitted,

_____
Camilla C. McKinney
D.C. Bar No. 448776
Law Offices of Camilla C. McKinney, PLLC
1100 Fifteenth Street, N.W., Suite 300
Washington, D.C. 20005
(202) 861-2934 (telephone)
(202) 517-9111 (facsimile)
CMcKinney@DCEmploymentLawyer.com
***Attorney for Plaintiff Yasmin A. Beckford***