## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**YASMIN A. BECKFORD,**                   )
                                          )
      **Plaintiff,**                  )
                                          )
      **v.**                          )   **Civil Action No. 06-1342 (ESH)**
                                          )
**TIMOTHY GEITHNER,**                     )
**SECRETARY OF THE TREASURY,**            )
                                          )
      **Defendant.**                  )
_____)

## MEMORANDUM OPINION

Plaintiff Yasmin Beckford has sued the Department of the Treasury ("Treasury") for retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-17.[1]  The Treasury now moves for summary judgment, and for the reasons stated herein, the motion will be granted.

## FACTUAL BACKGROUND

Ms. Beckford began working as a GS-301-12 Staff Assistant in Information Technology Services ("ITS") at the Internal Revenue Service ("IRS") of the Treasury in February 2004. (Compl. ¶ 4.)  Prior to her hiring at the IRS, Ms. Beckford had worked for over five years in the United States Peace Corps.  (*Id.*)  As a Staff Assistant in ITS, Ms. Beckford reported directly to Terence Lutes, then the Associate Chief Information Officer for ITS.  (Dep. of Yasmin Beckford

---

[1] Ms. Beckford's complaint also included claims that the defendant subjected her to sex discrimination, *quid pro quo* sexual harassment, and a hostile work environment by her supervisor.  (Compl. ¶ 1.)  Ms. Beckford filed a Stipulation of Partial Dismissal With Prejudice as to these claims, so only her retaliation claim remains.

["Beckford Dep."] at 27.)  A description of the position for which Ms. Beckford was hired states

that the job requires "[s]kill in dealing efficiently and effectively with top level executives" and

the "[a]bility to establish and maintain effective relationships with and gain confidence and

cooperation of supervisors, managers, and co-workers to accept proposals on complex issues."

(Attach. in Supp. of Def.'s Mot. for Summ. J., Report of Investigation ["ROI"] at 149.)  Ms.

Beckford's responsibilities included: management of Mr. Lutes' calendar, meeting schedule, and

travel arrangements; distribution of correspondence; maintenance of office logs; and other

related duties.  (Compl. ¶ 8; Beckford Dep. at 27.)  Much of Ms. Beckford's job involved

communication with the employees who reported directly to Mr. Lutes and other third parties.

(Compl. ¶ 10.)

        In October 2004, Mr. Lutes met with Ms. Beckford to provide her with a mid-year

performance review.  (*Id.* ¶ 26.)  At that time, Mr. Lutes informed Ms. Beckford that there were

areas in which she needed to improve her performance, such as maintenance of Mr. Lutes'

calendar.  (ROI at 28, 105.)  Mr. Lutes also discussed "problems reported with interpersonal

relationships between [Ms. Beckford] and the reporting offices, other staff and executives." (*Id.*

at 28.)  In a narrative summary received by Ms. Beckford after the meeting, he described

"unsolicited feedback" he had received regarding Ms. Beckford's conflicts with other staff and

executives and that there were reports of "major issues" regarding Ms. Beckford's dealing with

immediate staff members.  (*Id.* at 105; Beckford Dep. at 60.)  Mr. Lutes reminded her that she

was responsible for being a "team player" and stated that he believed in her ability to do so.

(ROI at 105.)

        In December 2004, Mr. Lutes again met with Ms. Beckford to discuss her work

performance.  (Compl. ¶ 33.)  He informed her that he "was not pleased with [her] progress on

the teamwork front" and that he had received comments from individuals inside and outside the

office regarding Ms. Beckford's difficulties in working with others.  (ROI at 26, 103.)  He also

noted that "there continue to be oversights on [Ms. Beckford's] part that detract from [her]

overall job performance," including calendar updates and the execution of her other duties.  (*Id.*

at 103.)  He stated that teamwork was a "significant component of [her] critical job elements"

and that to be successful, Ms. Beckford would need to demonstrate "significant improvement" in

this area.  (*Id.*)

On March 15, 2005, Mr. Lutes and Ms. Beckford had another meeting, prior to Ms.

Beckford's departure from ITS on a work detail.  (Compl. ¶¶ 46, 48.)  At that time, Mr. Lutes

again encouraged Ms. Beckford to focus on her working relationships.  (*Id.*; ROI at 102.)  He

informed Ms. Beckford that she would receive an annual appraisal before the end of April and

that it would not be "complimentary."  (ROI at 102; Beckford Dep. at 66.)  That same day, after

her meeting with Mr. Lutes, Ms. Beckford filed an informal Equal Employment Opportunity

("EEO") complaint with the IRS accusing Mr. Lutes of sexual harassment.  (Compl. ¶ 47.)

Approximately six weeks later, Ms. Beckford received her annual appraisal, covering the period

from April 2004 through March 2005.  (ROI at 162.)  Ms. Beckford received an overall rating of

2.4 or "minimally acceptable."  (*Id.*)  Ms. Beckford's lowest ratings were the areas of Workplace

Interaction, Workplace Involvement, Workplace Environment, and Communication (Oral and

Listening).  (*Id.*)  In the narrative portion of his review, Mr. Lutes cited Ms. Beckford's "regular

conflict with almost every member of the staff" and complaints about her "rudeness and lack of

cooperation" as reasons for her low ratings.  (*Id.* at 163.)

In May 2005, after Ms. Beckford received her annual appraisal, the National Background

Investigations Center ("NBIC") completed a background check of Ms. Beckford.  (Def.'s Mot.

for Summ. J ["Def.'s Mot."] Ex. 2, at 4.)  The background check, requested by the IRS on March

24, 2004—nearly a year before Ms Beckford filed her informal EEO complaint—was done for

all IRS employees, including those who had previously worked in other government agencies

and thus had undergone earlier background checks.  (*Id.*; Dep. of Kathy P. Jantzen ["Jantzen

Dep."] at 18, 22-25; Dep. of Sandra Strakal ["Strakal Dep."] at 35, 48-49.)  Ms. Beckford's

background check revealed that when she filled out her Questionnaire for Public Trust Positions

Standard Form 85P ("Form 85P") in 2004 as part of her hiring process, she failed to report that

she had filed for bankruptcy on three occasions in the previous seven years, but instead had only

disclosed one bankruptcy in 1997.  (Def.'s Mot., Ex. 2, at 4, 10-12, 15, 23.)

     The NBIC sent a report on Ms. Beckford to the IRS Human Capital Office, Labor

Relations ("LR") Section, identifying the discrepancy between Ms. Beckford's Form 85P and her

background check.  (ROI at 111-12.)  The report was received by Sandra Strakal on June 7,

2005.  (*Id.* at 112.)  At the IRS, when an employee background investigation reveals a problem,

the LR Section works with the employee's manager to decide whether a suitability determination

should be made or if disciplinary action should be imposed.  (Strakal Dep. at 19; Jantzen Dep. at

29-31, 33, 74-75.)  The manager who handles the disciplinary determination is the employee's

manager of record.  (Jantzen Dep. at 11-12, 34.)  Ms. Beckford's manager of record was Mr.

Lutes.  (*Id.* at 8-12, 51, 55, 68; Strakal Dep. at 138.)  Ms. Strakal advised Mr. Lutes of the range

of penalties for false statements in a job application.  (ROI at 112.)  According to the IRS Guide

for Penalty Determinations, the penalty range for an employee's first offense of "false statements

or misrepresentation on a job application concerning other documents or matters pertaining to

qualifications or concerning any official record or proceeding such as background

investigations" is anywhere from a "written reprimand to removal."  (*Id.* at 201-02, 206.)  Mr.

Lutes proposed that Ms. Beckford receive the minimum penalty—a letter of reprimand.  (Dep. of Terence Lutes ["Lutes Dep."] at 226-27; Strakal Dep. 100.)  Under IRS regulations, when an employee is to be issued a letter of reprimand, the agency must offer the employee "alternative discipline."  (Strakal Dep. at 103.)  Alternative discipline, if accepted, results in a nullification of the letter of reprimand so that it does not become a part of the employee's permanent record.  (*Id.*; ROI at 112; Beckford Dep. at 90.)   Mr. Lutes was required to offer Ms. Beckford the opportunity to request a form of alternative discipline, but he had the discretion to deny her request and issue the letter of reprimand.  (Strakal Dep. at 103-04.)

On August 2, 2005, Ms. Beckford received a letter from Mr. Lutes, informing her that the IRS was contemplating giving her a letter of reprimand based on her false statements regarding her bankruptcies.  (Def.'s Mot., Ex. 3 at 1.)  The letter offered Ms. Beckford the option of requesting an alternative form of discipline.  (*Id.*)  The next day, Ms. Beckford sent a letter to Mr. Lutes, apologizing for the "omission of the dates of [her] prior bankruptcy actions" and requesting alternative discipline in the form of a donation of used clothing, books, and games to a charity in Maryland.  (ROI at 77, 82.)  Mr. Lutes asked Ms. Beckford to include a cash donation of at least fifty dollars along with the other items but accepted her proposed alternative discipline on August 9.  (*Id.* at 82.)  Ms. Beckford agreed to the cash donation, and Ms. Strakal sent Mr. Lutes an alternative discipline agreement for him and Ms. Beckford to sign.  (Strakal Dep. at 117-18.)  Although Ms. Beckford carried out her obligations under the agreement, she did not sign the agreement.  (*Id.* at 126.)  Mr. Lutes continued to contact Ms. Beckford in an effort to obtain her signature on the agreement, but ultimately the matter was closed without Ms. Beckford's signature.  (ROI at 84-85; Lutes Dep. at 227-29; Strakal Dep. at 135; Def.'s Mot., Ex. 7.)

The IRS accepted Ms. Beckford's formal EEO complaint in September 2005.  (Compl. ¶ 49.)  She later amended her complaint to include retaliation claims.  (*Id.* ¶ 54.)  In October 2005, Ms. Beckford was reassigned to the Data Management Services Branch of the Business Systems Development Division of the IRS.  (*Id.* ¶ 55.)  She is still employed by the IRS. (Beckford Dep. at 5.)  Ms. Beckford now alleges that the low rating in her April 2005 annual appraisal and the suitability determination and discipline she received were retaliatory measures taken against her as a result of filing her original EEO complaint against the Treasury.

## ANALYSIS

### I.      STANDARD OF REVIEW

A motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  There is a "genuine issue" of material fact if a "reasonable jury could return a verdict for the nonmoving party." *Galvin v. Eli Lily and Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248).  A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).  However, the non-moving party "may not rely merely on allegations or denials

in its own pleading." Fed. R. Civ. P. 56(e)(2).  "While summary judgment must be approached

with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support

her allegations by affidavits or other competent evidence showing that there is a genuine issue

for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998),

*aff'd* No. 99-5126, 1999 WL 825425 (D.C. Cir. Sept. 27, 1999) (internal citation omitted).

## II.     LEGAL STANDARD FOR RETALIATION CLAIMS UNDER TITLE VII

Under Title VII, it is unlawful for an employer to discriminate against an employee

because she "has opposed any practice made an unlawful employment practice" by Title VII or

because she "has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  "The anti-

retaliation provision protects an individual not from all retaliation, but from retaliation that

produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67

(2006).  To prove a retaliation claim under Title VII, a plaintiff "generally must establish that he

or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to

bring a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008); *see

also* 42 U.S.C. § 2000e-3(a).  A "materially adverse" action is one that would have "dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S.

at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "The issue of

whether a particular employment action was 'materially adverse' is fact-intensive and 'depends

upon the circumstances of the particular case, and should be judged from the perspective of a

reasonable person in the plaintiff's position, considering all the circumstances.'" *Howard v.

Gutierrez*, 237 F.R.D. 310, 313 (D.D.C. 2006) (quoting *Burlington*, 548 U.S. at 71) (internal

quotations omitted).  A plaintiff must also prove that he or she engaged in protected behavior and

that a causal connection exists between that behavior and the adverse action. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).

"[R]etaliation claims based on circumstantial evidence—like [Beckford's]—trigger the familiar burden shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  However, where a defendant "has asserted a legitimate, non-discriminatory reason for [its action], the district court need not-*and should not*-decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Rather, at that point, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence."[2] *Jones*, 557 F.3d at 677 (quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)).  "Evidence" includes "not only the prima facie case but also the evidence the plaintiff offers to 'attack the employer's proffered explanation for its action' and other evidence of retaliation." *Id.*

A plaintiff has the burden of persuasion to show that a defendant's proffered non-discriminatory reason for the challenged action is a pretext. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003).  A plaintiff can carry this burden by showing that a non-discriminatory reason offered by a defendant is false, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008), or otherwise "presenting enough evidence to allow a reasonable trier of fact to conclude that the proffered explanation is unworthy of credence."

---

[2] If a defendant also disputes the existence of a "materially adverse" action, in addition to providing non-discriminatory reasons for that action, courts may choose to address that issue before proceeding to the question of whether the plaintiff has produced enough evidence to show that the actions were retaliatory. *See Baloch*, 550 F.3d at 1198-1200 (engaging in adversity inquiry first).

*Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks omitted).  A plaintiff may also "attempt[] to produce evidence suggesting that the employer treated other employees . . . more favorably in the same factual circumstances" than the employer treated the plaintiff.  *Brady*, 520 F.3d at 495.  Where "the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts," and summary judgment is appropriate.  *Id.*; *see also Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997) ("[I]f [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for [retaliation], summary judgment must be entered against [plaintiff].")

### III.    THE CHALLENGED ACTIONS

#### A.  Formal Performance Appraisal

Defendant concedes that Ms. Beckford's minimally successful performance appraisal constituted a materially adverse action because "there is some evidence that [the review] temporarily affected her future employment opportunities."  (Def.'s Mot. at 14.)  *See also Burlington*, 548 U.S. at 67-68.  It asserts that Ms. Beckford's negative review was the result of her supervisor's ongoing dissatisfaction with her work performance, not a consequence of her EEO complaint.  (Def.'s Mot. at 16.)  Because the Treasury has articulated a non-discriminatory reason for Ms. Beckford's performance evaluation, the Court must determine whether Ms. Beckford has produced sufficient evidence for a reasonable jury to infer retaliation.  *Brady*, 520 F.3d at 494.

The Court finds that Ms. Beckford has not satisfied this standard.  The record supports the Treasury's explanation that Mr. Lutes was disappointed with Ms. Beckford's work

performance many months before she filed her informal EEO complaint on March 15, 2005.  On

three separate occasions prior to Ms. Beckford's filing of her EEO complaint, Mr. Lutes

communicated his dissatisfaction with her teamwork difficulties and encouraged her to improve

her working relationships with executives and staff at the IRS.  (ROI at 28, 102-05.)  Indeed, on

the final such occasion, Mr. Lutes explicitly informed Ms. Beckford that she would be receiving

a negative evaluation because of her poor interoffice relationships.  In her deposition, Ms.

Beckford stated that, *prior to* her first contact with the EEO office, "Lutes had told [her] that

[she] wasn't . . . going to get a performance appraisal that was complimentary."  (Beckford Dep.

at 66.)   In the review itself, Mr. Lutes cited Ms. Beckford's conflicts with individuals inside and

outside of the office as the reason for her low ratings.  (ROI at 163.)  Given the substantial and

uncontested evidence of Mr. Lutes' concerns regarding Ms. Beckford's work performance and

his communication of those concerns—and the fact that they would result in an unsatisfactory

appraisal—to Ms. Beckford before she filed her complaint, a jury could not reasonably infer that

the negative appraisal was caused by Ms. Beckford's contact with the EEO office.

 Ms. Beckford argues that the "close proximity in time between" her EEO complaint and

her annual performance review is enough to create an inference of causation.  (Pl.'s Opp'n at

20.)  Although Ms. Beckford is correct that "mere temporal proximity" can permit an inference

sufficient to support a prima facie case of retaliation, evidence of "intent at the prima facie stage

does not resolve the question of retaliation *vel non*," which is the issue before the Court.  *Jones*,

557 F.3d at 679.  Simply put, Ms. Beckford must produce sufficient evidence for a reasonable

jury to find that Mr. Lutes' dissatisfaction with her professional performance was not the actual

reason for the negative review she received.  *Brady*, 520 F.3d at 494.  It is undisputed that Mr.

Lutes intended to give Ms. Beckford an unfavorable evaluation *before* she filed her complaint.

(Beckford Dep. at 66.)   Given the evidence that Mr. Lutes had long been displeased with Ms.

Beckford's work performance, "mere temporal proximity" between the EEO complaint and the

review does not satisfy Ms. Beckford's burden.   "[A]n adverse employment action following

soon after the employee's engagement in the protected activity cannot establish causation if the

employer contemplated the adverse action *before* the employee's protected activity."   *Riggiladez

v. Harvey*, 510 F. Supp. 2d. 106, 110 (D.D.C. 2007); *see also Clark County Sch. Dist. v.

Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend *previously planned* [actions]

upon discovering that a Title VII suit has been filed, and their proceeding along lines *previously

contemplated*, though not yet definitively determined, is no evidence whatever of causality.")

(emphases added).   The record reflects that Ms. Beckford's poor performance review was in

progress before her complaint was filed, and thus, the proximity of those events cannot prove

causality.

Beyond failing to show a causal connection between the protected activity and the

challenged action, Ms. Beckford has provided insufficient evidence for a jury to infer that the

defendant's stated reason for Ms. Beckford's poor review—her failure to establish and maintain

positive working relationships with others inside and outside the IRS—is a pretext for retaliation.

Specifically, Ms. Beckford has provided no evidence disputing that Mr. Lutes was dissatisfied

with Ms. Beckford's work performance before she filed her EEO complaint.  Ms. Beckford

contends that Mr. Lutes was "generally complementary [sic]" of Ms. Beckford's performance

and cites the November 2004 memorandum Mr. Lutes sent to Ms. Beckford regarding her mid-

year review.  (Pl.'s Opp'n at 33.)  Yet, Mr. Lutes states in that memorandum that his "primary

area of concern" with Ms. Beckford is "in the arena of teamwork."  (ROI at 105.)  He stated that

he had "become aware of how broad and deep the relationship issue were [sic]" and that when he

had followed up with other staff members, he "found that there were major issues there also."

(*Id.*)  Far from complimenting Ms. Beckford, this memorandum suggests that Mr. Lutes was

aware that Ms. Beckford was having difficulties performing critical aspects of her job.  Indeed,

the very next month, Mr. Lutes met with Ms. Beckford again and informed her that he "was not

pleased with the progress on the teamwork front."  (*Id.* at 103.)  He also noted that there

"continue to be oversights on [Ms. Beckford's] part that detract from [her] overall job

performance."  (*Id.*)  Nowhere does Ms. Beckford suggest that these reviews, which are

consistent with Ms. Beckford's annual appraisal, are a pretext for retaliation—indeed, she cannot

reasonably make such a suggestion, as Mr. Lutes authored these memoranda months before Ms.

Beckford contacted the EEO office.[3]

Ms. Beckford also points to praise she received from others and the fact that one of her

other supervisors, Kathy Jantzen, stated that she had no work issues with Ms. Beckford as

evidence that the Treasury's stated reason for Ms. Beckford's appraisal is a pretext.  (Pl.'s Opp'n

at 33-34.)  However, the question before the Court is not whether the negative evaluation of Ms.

---

[3] Ms. Beckford argues that at the very least, a jury could infer that retaliation "was among the motivating factors which led to the [negative appraisal]," even if retaliation was not "the only motive or even . . . the determinative motive."  (Pl.'s Opp'n at 35.)  However, it is generally established that the "mixed-motive" theory is not available to prove a retaliation claim.  *See*, *e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001); *Speedy v. Rexnord Corp.*, 243 F.3d 397 (7th Cir. 2001); *Matima v. Celli*, 228 F.3d 68 (2d Cir. 2000); *Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848 (8th Cir. 2000); *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544 (4th Cir. 1999); *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997); *Tanca v. Nordberg*, 98 F.3d 680 (1st Cir. 1996).  The issue remains an open question in this Circuit.  *See Borgo v. Goldin*, 204 F.3d 251, 256 n.6 (D.C. Cir. 2000).  Yet, the reasoning of the Supreme Court in *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009), finding that the Age Discrimination in Employment Act does not authorize mixed-motive claims on the ground that the statute only prohibits discrimination "because of" an individual's age, appears applicable to the anti-retaliation provision of Title VII, which also prohibits discrimination only "because" the employee has engaged in a protected act.  42 U.S.C. § 2000e-3.  As such, the suggestion that retaliation was "among" the factors motivating Ms. Beckford's review is insufficient as a matter of law to defeat summary judgment.

Beckford was justified or fair, but rather whether her employer believed it to be a result of her poor work performance. *Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers.'") (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)). The Court cannot "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Id.* (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)). Even if other individuals at the IRS felt that Ms. Beckford's work performance was excellent, there is substantial evidence showing that the individual responsible for writing her annual review, Mr. Lutes, did not agree and reviewed her accordingly.

Finally, Ms. Beckford cites a handful of phrases from two paragraphs of an eleven-page declaration by Mr. Lutes written six months after Ms. Beckford's appraisal as evidence that Mr. Lutes "harbored discriminatory animus" toward Ms. Beckford and accordingly reviewed her as he did because of her EEO complaint. (Pl.'s Sur-Reply at 4.) She argues that Mr. Lutes' comments in his declaration would allow a reasonable jury to "conclude that the minimally satisfactory review was given in retaliation for Ms. Beckford's protected activity." (*Id.*) The Court finds this argument unpersuasive. Mr. Lutes repeatedly states in the document from which plaintiff quotes that he reviewed Ms. Beckford as he did because of her poor work performance. (*See*, *e.g.*, ROI at 89-91.) And the paragraphs from which plaintiff quotes in her opposition are consistent with the defendant's position that Ms. Beckford's inability to work well with others motivated Mr. Lutes' review.[4]

---

[4] In his declaration at the investigation stage, Mr. Lutes stated:

I would only add that the Complainant is clearly a very disturbed woman. She was never a person who was pleasant to be around and as time went on, a number of employees developed a fear of her. One thing that came out in the TIGTA employment background investigation was that there were some people outside of IRS who viewed her the same way. Looking back, I was far too patient with her, thinking that with counseling the attitude, behavior and work performance would get better. They only got progressively worse. They got so bad, based upon what I observed and complaints from ALL other employees in the office, that I did reassign her to temporary positions outside the office. It was temporary because of the rules around the RIF which blocked a permanent reassignment during FY 2005. As I committed to her at the time, here in 2006 we will make a permanent reassignment.

Once the TIGTA investigation began and other employees were interviewed, these employees became more explicit to me about their treatment by her. I must admit that when I heard the full stories, I, as a manager and executive, was embarrassed that I had allowed multiple employees working for me to be treated that badly by another employee. But by this point, false accusations had also been leveled at me so I could, in reality, do nothing about it or it would certainly appear to be reprisal. When she made up, and I had suspected this to be the case from the beginning, stories about other employees, I assumed that something had happened that the Complainant had for some reason translated very differently than the other party. I [sic] LR and EEO cases over the years, I have observed this numerous times. It took totally fabricated stories against me personally before I fully understood, or accepted, the degree of the problem with the Complainant. And let me say clearly that, I myself, others in the office that have been subjected to her complaints, and even the TIGTA investigator, believe that she actually believes these events happen. Again, this is a very disturbed woman but as her manager of record, and one of the accused, I would put myself at risk to address it. I have never felt so powerless in my 35 years in government. Somehow this needs to be addressed or other managers/executives will be subjected to this same situation again in the future.

(ROI at 95-96.)

This language is not of the sort that courts have "previously considered probative of establishing discriminatory [or retaliatory] animus," such as "crude, derogatory, and highly offensive remarks" and "statements directly connected to [an] employer's desire to terminate" an employee.  *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006).  Ms. Beckford contends that Mr. Lutes' comments demonstrate that "it took a sexual harassment complaint from Ms. Beckford for Mr. Lutes to decide that she had teamwork issues that affected her job performance" (Pl.s Sur-Reply at 4), but as discussed, four months *before* Ms. Beckford filed her EEO complaint, Mr. Lutes told Ms. Beckford unequivocally that his "primary area of concern [with her work] is in the arena of teamwork."  (ROI at 105.)  Ms. Beckford surmises that Mr. Lutes' statement that he did not understand "the degree of the problem with the Complainant" until she filed "fabricated stories" against him indicates that he gave her a poor performance review as a result of the complaint (Pl.'s Sur-Reply at 4), but she offers no support for this conjecture.  Given the wealth of undisputed evidence as to the reasons behind Ms. Beckford's performance review and the fact that it was planned and communicated to plaintiff even before she filed her complaint, one cannot conclude that Mr. Lutes' statements in these paragraphs demonstrate retaliatory animus and that such animus motivated his appraisal of Ms. Beckford without "go[ing] far beyond reasonable inference . . . into the realm of unfettered speculation." *Holcomb*, 433 F.3d at 901.   As such, the Court finds that summary judgment is appropriate with respect to Ms. Beckford's claim concerning her performance evaluation.

## B.  The Suitability Determination, Proposed Letter of Reprimand, and Alternative Discipline

Ms. Beckford alleges that her suitability determination and the alternative discipline she received also constitute materially adverse retaliatory actions.  (Pl.'s Opp'n 7-11, 18, 29-31.)

Plaintiff has not, however, demonstrated that the suitability determination and resulting discipline were materially adverse nor has she presented sufficient evidence for a reasonable jury to infer that these actions were motivated by a retaliatory animus.

### 1.   Material Adversity

Ms. Beckford first alleges that the suitability determination was materially adverse because she had "reason to be chilled by this action and the real possibility that her penalty, if an alternative discipline was not accepted by Mr. Lutes, could have ranged from a Letter of Reprimand ("LOR") up to termination from Federal Service."  (Pl.'s Opp'n at 9.)  She also states that she "faced further uncertainty, for approximately five months, as to whether she would receive the alternative discipline or a more harsh punishment, such as termination or a letter of reprimand."  (*Id.*)

Essentially, Ms. Beckford alleges that while her suitability determination was pending, she feared a harsher penalty than the one she actually received.  Yet, "courts have been unwilling to find adverse actions where the [proposed action] is not actually served."  *Baloch*, 550 F.3d at 1199 (finding no material adversity where proposed decision on possible suspension "had no actual effects").  Here, Ms. Beckford never received a penalty other than alternative discipline, and there is no objective evidence that she had reason to fear punishment more severe than a letter of reprimand.  There is nothing in the record to indicate that Mr. Lutes or anyone at the IRS considered or proposed any such discipline, nor was Ms. Beckford ever informed that harsher punishment was a possibility.  (ROI at 112; Strakal Dep. at 100, 102-04; Lutes Dep. 226-28.)  Plaintiff learned that the IRS was considering issuing her a letter of reprimand on August 2, 2005.  (Def.'s Mot., Ex. 3 at 1; ROI at 112.)  She responded and requested alternative discipline in the form of a donation on August 3, 2005.  (ROI at 112.)  The record indicates that Ms.

Beckford was informed that her manager of record, Mr. Lutes, had agreed to her proposed

alternative discipline on August 9, 2005.  (*Id.*; Strakal Dep. at 118.)  On or before August 19,

2005, Ms. Beckford received a written agreement for her and Mr. Lutes to sign that confirmed

that the IRS had agreed to alternative discipline in lieu of a letter of reprimand. (Strakal Dep. at

119; Def.'s Mot. Ex. 8 at 1.)  In order to support a claim under Title VII, a plaintiff "must

demonstrate 'materially adverse consequences . . . such that a reasonable trier of fact could

conclude that the plaintiff has suffered objectively tangible harm.'"  *Rochon*, 438 F.3d at 1219

(quoting *Brown v. Brody*, 199 F.3d 446, 457 (1999)).  Ms. Beckford has provided no objective

evidence that her fear of more significant penalties had any basis in fact.[5]  As such, the suitability

determination did not constitute a materially adverse action by the defendant.

 Aside from her fear of greater punishment, Ms. Beckford also alleges that while she was

"being investigated, and until a final decision was made to give her alternative discipline, Ms.

Beckford was in a professional limbo . . . ."  (Pl.'s Opp'n at 9.)  She argues that "[a]n active

investigation by the IRS that she allegedly gave false information on her employment

application, coupled with a minimally satisfactory review, precluded [her] from being a viable

candidate for any position."  (*Id.*)  Had Ms. Beckford been turned down for various positions

because she was undergoing a suitability determination, that determination arguably would have

---

[5] Ms. Beckford alleges that she had reason to fear "the threat of a more severe punishment"
because of emails she received from Mr. Lutes between August and October 2005, requesting
her to sign the alternative discipline agreement prepared by the LR Section.  (Pl.'s Opp'n at 30-
31.)  The emails stated that if Ms. Beckford did not sign the agreement, it would be nullified and
Mr. Lutes would "have to revert to the original proposed action," which was a letter of
reprimand.  (ROI at 84-85.)  Setting aside the substantial evidence in the record that but for Ms.
Beckford's refusal to sign the agreement, the suitability determination, and the "threat" of a letter
of reprimand, would have ended in August (Strakal Dep. at 119, 121-23; Jantzen Dep. at 78;
Def.'s Ex. 6.), at worst, Ms. Beckford faced a letter of reprimand.  There is no evidence that the
possibility of receiving a letter of reprimand that was never written resulted in any sort of
tangible consequences of the type required for a finding of material adversity.  *See Baloch*, 550
F.3d at 1199.

been a materially adverse action.  However, Ms. Beckford provides no objective evidence that

she was ever denied a position due to an ongoing suitability determination.  She cites three

positions for which she was not hired, but then concedes, consistent with the record, that the

reason she was not selected for those positions was that she had "received [a] less than fully

successful performance evaluation."  (*Id.*; ROI at 43-45.)  Nor is there any evidence, as opposed

to unsupported statements by plaintiff, that the "suitability determination was yet another strike

against [Ms. Beckford] that hindered her professional progress."  (Pl.'s Opp'n at 18.)  Plaintiff's

subjective fear that the suitability determination made her a less viable employee does not

constitute material adversity, as "[p]urely subjective injuries . . . are not adverse actions."  *Fokkio*

*v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002).  Accordingly, the suitability determination

was not materially adverse.

Finally, Ms. Beckford alleges that the alternative discipline she received—that is, the

donation of clothing, toys, and cash she made to charity—was materially adverse.  (Pl.'s Opp'n

at 18-19.)  Yet, there is no support for her contention that the alternative discipline "negatively

impacted [her] career and caused her harm."  (*Id.* at 18.)  The alternative discipline chosen and

agreed to by Ms. Beckford replaced a possible letter of reprimand, the minimum penalty for the

infraction Ms. Beckford concedes she committed.  (Strakal Dep. at 103; Jantzen Dep. 76-78;

Pl.'s Opp'n at 8; ROI at 112.)  There is no evidence that Ms. Beckford's donation had any

tangible consequences for her of the sort required for a finding of material adversity.  *See*

*Baloch*, 550 F.3d at 1199 (finding that letter of reprimand intended to improve employee's

performance was not materially adverse).  Indeed, the record indicates that the purpose of

alternative discipline at the IRS is to "positively change an employee's conduct" and prevent the

need for "traditional" discipline that carries possible consequences, such as a letter of reprimand

that becomes a "matter of record."  (Def.'s Ex. 8 at 2; ROI at 112, 198; Jantzen Dep. 76-77;

Beckford Dep. at 90.)  Therefore, the Court finds that the alternative discipline requested by Ms.

Beckford would not have dissuaded a reasonable employee from engaging in actions protected

by Title VII.  *Rochon*, 438 F.3d at 1219.

### 2.   Pretext

Even assuming *arguendo* that Ms. Beckford's suitability determination, proposed letter of

reprimand, and alternative discipline do constitute materially adverse actions, plaintiff has not

adduced sufficient evidence for a reasonable jury to infer that the Treasury's stated reasons for

these actions were pretextual.  The defendant maintains that Ms. Beckford's determination and

alternative discipline were corrective actions imposed pursuant to agency rules regarding

misstatements on employment applications.  (Def.'s Mot. at 22; Def.'s Statement of Material

Facts as to Which There is No Genuine Issue at 6-9.)  The record supports this explanation.  As

conceded by Ms. Beckford (Pl.'s Opp'n at 8), she failed to disclose prior bankruptcies on her

Form 85P in violation of clearly promulgated IRS regulations.  (ROI at 77, 112, 201, 206; Def.'s

Mot., Ex. 1 at 7, Ex. 2 at 4-5, 10-12.)  The record also indicates that the process of engaging in a

suitability determination, proposing a letter of reprimand, and imposing alternative discipline for

this kind of infraction is standard agency procedure.  (ROI at 112, 198, 201-02; Strakal Dep. at

15-24; Jantzen Dep. at 74-78.)  The background investigation leading to the discovery of

discrepancies in Ms. Beckford's application was required for all employees, regardless of

previous employment.  (Jantzen Dep. 18-20, 22-24; Strakal Dep. at 49.)  Plaintiff has not

disputed this evidence, nor has she made any showing that she was treated differently than other

IRS employees.  Furthermore, Ms. Beckford has not demonstrated a causal connection between

her disciplinary proceeding and her EEO complaint.  The background investigation that resulted

in plaintiff's suitability determination was requested a year before she contacted the EEO office. (Def.'s Mot., Ex. 2 at 4, 123.)  Ms. Beckford therefore cannot reasonably suggest that the initiation of the investigation was retaliation for a complaint that did not yet exist.

Ms. Beckford argues that the temporal proximity between her contact with the EEO office and the proposed letter of reprimand over four months later creates an inference of retaliation.  (Pl.'s Opp'n at 20.)  But the record indicates that the report revealing Ms. Beckford's Form 85P omissions was not received by the LR Section of the IRS until June 7, 2005, almost three months after Ms. Beckford contacted the EEO office on March 15.  (ROI at 112.) Moreover, for temporal proximity to be sufficient evidence of causality, the protected act and the suspected retaliation must be "very close" in time, not several months apart.  *Clark County Sch. Dist.*, 532 U.S. at 273-74.  And where there is a reasonable explanation for the defendant's actions, more than "mere proximity" is required to show that such an explanation is not genuine. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).

Ms. Beckford also contends that the involvement of Mr. Lutes, the individual she accused of sex harassment, in her suitability determination and alternative discipline is evidence of pretext.  (Pl.'s Opp'n at 24-29.)  She suggests that there was "no need for Mr. Lutes to be involved with, let alone lead, the disciplinary proceeding" because "he no longer managed or supervised [her]." (*Id.* at 25.)  The record belies Ms. Beckford's contention.  There is undisputed evidence that when a problem arises in an IRS employee investigation, that employee's manager of record decides whether a suitability determination or disciplinary action should be made. (Strakal Dep. at 20, 138; Jantzen Dep. at 8-12, 17, 29-31, 74-75.)  An employee's manager of record remains the same even if the employee is detailed to another manager.  (Jantzen Dep. at

11-12.)  Ms. Beckford's manager of record was Mr. Lutes.  (Strakal Dep. at 138; Jantzen Dep. at 8-9, 51, 55, 68.)

Ms. Beckford relies heavily on deposition testimony from Ms. Strakal and Kathy Jantzen, the IRS deputy Chief Information Officer for Operations, to argue that Mr. Lutes' involvement in Ms. Beckford's proceedings was anomalous or somehow deviated from standard IRS procedure. (Pl.'s Opp'n at 25-29.)  However, both Ms. Strakal and Ms. Jantzen stated unequivocally in their depositions that Terence Lutes was Ms. Beckford's manager of record and that therefore he was appropriately involved in Ms. Beckford's suitability determination.  (Jantzen Dep. at 8-9, 30, 55, 68; Strakal Dep. at 138.)  Although Ms. Beckford suggests that it "defies logic and common sense" for Mr. Lutes to have been involved in her disciplinary proceeding (Pl.'s Opp'n at 28), it is not for this Court "to second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach*, 86 F.3d at 1183 (quoting *Milton v. Weinberger*, 696 F.2d at 100).  Here, the record demonstrates that the IRS followed its standard procedure in handling Ms. Beckford's suitability determination and discipline.  Accordingly, the Court finds that Mr. Lutes' involvement in Ms. Beckford's disciplinary process is not sufficient to allow a reasonable jury to infer that the non-discriminatory reason defendant has provided for its actions is "phony." *Pignato v. Am. Trans. Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994).

Ms. Beckford then suggests that Mr. Lutes "unnecessarily prolonged" her disciplinary proceeding and that this, too, is evidence of retaliation.  (Pl.'s Opp'n at 29-31.)  However, as discussed, there is substantial evidence that Ms. Beckford's suitability determination would have ended as early as August 19, 2005, but that her decision not to sign the alternative discipline agreement prevented administrative closure until October 17.  (Def.'s Mot., Ex. 3 at 1-6; Strakal Dep. 117-19.)  Ms. Beckford maintains that it was unreasonable for Mr. Lutes to "insist[]" on

obtaining Ms. Beckford's signature on the agreement even though she completed the terms of her discipline (Pl.'s Opp'n at 30), but the record suggests that Mr. Lutes was attempting to follow standard procedure.  Ms. Jantzen testified that "typically" everyone involved in the alternative discipline process signs the discipline agreement.  (Jantzen Dep. at 78.)  Ms. Strakal, the human resources specialist working with Mr. Lutes during the determination, explained to Mr. Lutes in an email on September 20 that she would need Ms. Beckford's "signed AD agreement" to "close out the case."  (Def.'s Mot., Ex. 6.)  Mr. Lutes stated that "it's a normal standard process that [Ms. Beckford] sign the agreement."[6]  (Lutes Dep. at 229.)  In light of this evidence, Mr. Lutes' effort to obtain Ms. Beckford's signature on the agreement was reasonable and provides no basis on which to argue that defendant did not discipline Ms. Beckford because of her failure to report her bankruptcies but rather because of her EEO complaint.  Accordingly, the Court finds that all of the evidence, taken together, is "insufficient to support a reasonable inference" that Ms. Beckford's suitability determination and alternative discipline were retaliatory actions, and summary judgment is therefore appropriate.  *Jones*, 557 F.3d at 678.

---

[6] Ms. Beckford argues that once Mr. Lutes was informed on September 20 that it was possible for him to close the case with his signature and a statement that Ms. Beckford refused to sign, there was "no need" for him to continue his attempts to obtain her signature.  (Pl.'s Opp'n at 30; *see also* Def.'s Ex. 6.)  Again, whether it was sensible for Mr. Lutes to seek Ms. Beckford's signature after September 20 is not for this Court to decide.  *See Fischbach*, 86 F.3d at 1183. Evidence that Mr. Lutes, out of an abundance of caution, sought Ms. Beckford's signature pursuant to his understanding of IRS procedure (*see* Lutes Dep. at 229), fails to support any inference that defendant disciplined Ms. Beckford in retaliation for her EEO claim.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is granted, and the complaint in the above-captioned action is dismissed with prejudice.  A separate order accompanies this Memorandum Opinion.

**SO ORDERED.**

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   October 15, 2009